IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LAURIE PRICE,                                     3:18-cv-00540-BR

        Plaintiff,                           OPINION AND ORDER

v.

DR. STEVE SHELTON; DR. ROBERT
SNIDER; MENDOZA, RN; and
DR. PENG,

        Defendants.


**JUAN C. CHAVEZ**
P.O. Box 5248
Portland, OR 97208
(503) 944-2270 ext. 212

        Attorney for Plaintiff

**ELLEN F. ROSENBLUM**
Attorney General
**NATHANIEL AGGREY**
Assistant Attorney General
1162 Court Street N.E.
Salem, OR 97301-4096
(503) 947-4700

        Attorneys for Defendants

1 - OPINION AND ORDER

**BROWN, Senior Judge.**

This matter comes before the Court on Defendants' Motion (#44) for Summary Judgment.  The Court concludes the record is sufficiently developed, and, therefore, oral argument would not be helpful to resolve this Motion.  For the reasons that follow, the Court **GRANTS** Defendants' Motion.

## BACKGROUND

The following facts are taken from Plaintiff's Amended Complaint and the parties' materials related to Defendants' Motion for Summary Judgment and are viewed in the light most favorable to Plaintiff.

At all relevant times Plaintiff Laurie Price was an inmate at Coffee Creek Correctional Facility (CCCF).

On Plaintiff's May 7, 2013, intake form completed when she entered custody at CCCF Plaintiff reported the following medical and mental-health issues:

> Lumbar spondylosis, abdominal aneurysm, thyroid problems, heart arrhythmia, irregular heartbeat, chronic ear infections, chronic bronchitis, chronic emphysema, asthma, chronic pain in back, prolapsed bowel/impactions, arthritis, stomach trouble, Gastrointestinal /Crohn's disease related symptoms, rectal bleeding/hemorrhoids, and had been hospitalized for several medical issues, among others.

Joint Statement of Agreed Facts at 2.  Plaintiff also reported on her intake form that she suffered panic attacks and took various

2 - OPINION AND ORDER

medications for anxiety.  Plaintiff states in her Response to
Defendants' Motion for Summary Judgment that the "period . . . at
issue in this case begins with . . . her issues with rectal
bleeding around February 9, 2015."

On February 9, 2015, Plaintiff underwent a colonoscopy and
upper endoscopy to evaluate her "gastrointestinal bleed, iron
anemia, and an upper GI bleed."  Joint Statement of Agreed Facts
at 3.  The  colonoscopy and upper endoscopy reflected proctitis,
left-sided colitis, and "mild gastritis."  Decl. of Juan Chavez,
Ex. 1 at 1.  A March 17, 2015, chart note reflects a biopsy of
Plaintiff's colon showed ulcerative colitis, a biopsy of her
small intestine and stomach was benign and did not reflect celiac
disease, and a "polyps biopsy" was negative for Pylori.  Chavez
Decl., Ex. 1 at 2.  On March 20, 2015, Plaintiff requested
information on Crohn's disease and a "low residue" or a gluten-
free diet.  *Id*.  Defendant Nurse Mendoza advised Plaintiff that a
gluten-free diet was "not indicated" for her condition.  *Id*.
Nevertheless, on April 17, 2015, Plaintiff "was approved a low
residue diet for one year."  Joint Statement of Agreed Facts
at 4.

On December 29, 2015, Plaintiff requested Ensure "due to
history of Crohn's disease" and because of her weight loss.
Nurse Mendoza noted "no significant findings" on examination of
Plaintiff and advised Plaintiff that Ensure "isn't medically

necessary."  Chavez Decl., Ex. 4 at 1.

Plaintiff was seen by medical staff at CCCF approximately 12 times between December 29, 2015, and April 10, 2016, for issues related to her various conditions.

On April 10, 2016, Plaintiff was admitted to the infirmary at CCCF "due to an exacerbation of her uncreative [*sic*] colitis." Joint Statement of Agreed Facts at 5.  Plaintiff was referred to Legacy Meridian Park Hospital and admitted at 8:20 a.m. Plaintiff reported abdominal pain, blood in her stool, and abdominal distention.  Plaintiff "was examined by Dr. Van Kleek who ordered labs and a computed tomography scan . . . of [Plaintiff's] abdomen and pelvis."  *Id*.  Diagnostic testing reflected Plaintiff did not have anemia, but she did have "some hypokalemia" and "C. difficile colitis."  *Id*.  Dr. Van Kleek diagnosed Plaintiff with "gastrointestinal hemorrhage and an unspecified gastrointestinal hemorrhage type."  *Id*.  Dr. Van Kleek prescribed Prednisone "20 mg tablet.  Take 2 tablets by mouth daily each day x 1 week.  1 tablet each day for the 2nd week.  ½ tablet for the 3rd week.  Dispense/supply:  30 tablets. No refills."  *Id*.  Plaintiff was discharged from Legacy Meridian Park Hospital at 12:43 p.m. and transported back to the infirmary at CCCF.

On April 11, 2016, Plaintiff "no longer had bloody stool and was discharged from the infirmary."  Joint Statement of Agreed

Facts at 5.

On April 22, 2016, Plaintiff reported to medical staff that "they put me in the kitchen!  I can't work!  I have Crohn's, having a flare. . . .  I need to be medically unassigned." Chavez Decl., Ex. 6 at 1.

On April 25, 2016, Plaintiff was seen by Nurse Mendoza. Plaintiff advised Nurse Mendoza that she could not work in the kitchen due to her Crohn's flare-up.  Plaintiff reported rectal discomfort, but she denied rectal bleeding.  Nurse Mendoza took Plaintiff off of kitchen work detail.

On April 28, 2016, the medical record reflects a corrections officer requested medical emergency support related to Plaintiff:

> Per officer report, pt observed vomiting into a
> bucket at her bedside x20 min; prior to that pt
> out in BR on toilet x30 min.  Pt reported to
> officer that she filled the toilet with blood, and
> that she is too weak to walk to the BR from her
> bunk.  "Ferguson, if you can't send me to the
> hospital, send me back to my unit; they won't do
> [illegible] for me in the infirmary."

Chavez Decl., Ex. 6 at 3.  Plaintiff was admitted to the CCCF infirmary.  Defendant Robert Snider, M.D., "referred [Plaintiff] to an outside emergency department for further evaluation.  The emergency-department doctor recommended Plaintiff "taper off prednisone, two 20 mg tablets daily 1 week, then one 20 mg tablet daily 1 week, then one 10 mg tablets daily."  Joint Statement of Agreed Facts at 6.

On April 29, 2016, Plaintiff was admitted to Legacy Meridian

5 - OPINION AND ORDER

Park Hospital for evaluation and treatment of her gastro-intestinal issues.  Plaintiff remained at the hospital for 18 days.  When Plaintiff checked in on April 29, 2016, a CT scan of her abdomen and pelvis reflected a "mild increase . . . in the rectal wall thickening consistent with proctitis.  Large uterine mass again identified unchanged."  Joint Statement of Agreed Facts at 6.  An x-ray of Plaintiff's abdomen showed "[n]o signs of obstruction of free air.  Distention of a portion of the sigmoid colon."  *Id*.

On May 3, 2016, Plaintiff underwent a flexible sigmoidoscopy that reflected "[p]atchy indurated erythema without fluctuance or fistula opening[,] . . . [r]ectal tenderness and non-thrombosed external hemorrhoids[, and] . . . [i]nflammation . . . from the anus to the rectum secondary to left-sided ulcerative colitis."  Joint Statement of Agreed Facts at 6.  Plaintiff also underwent "several x-rays" of her abdomen and a pulmonary bronchoscopy.

On May 17, 2016, Plaintiff was discharged from Legacy Meridian Park Hospital.  Plaintiff's discharge notes stated she "requested more narcotics and more anxiety medications," but "she was advised about the need to taper down on those medications."  Joint Statement of Agreed Facts at 6.  Plaintiff's discharge notes reflected Plaintiff "understands that she needs to wean down her doses of narcotics because she's developed some bowel sluggishness from them," but Plaintiff advised "she's right on

6 - OPINION AND ORDER

the edge of receiving adequate pain and anxiety medications, and that she would not tolerate any more decreases." *Id*.  Finally, Plaintiff's discharge summary also noted she could "return to her regular diet." *Id*.

On May 18, 2016, Dr. Snider saw Plaintiff to manage her medication and anxiety after her return from Legacy Meridian Park Hospital.  On May 19, 2016, Dr. Snider referred Plaintiff back to the hospital.  She was admitted on May 20, 2016.  Plaintiff's "[n]arcotic bowel was thought to contribute to [her] dilated colon," and, therefore, Plaintiff's prescription for MS Contin was tapered to "15 mg. every 12 hours and her Zanax dose was increased to make the narcotic taper tolerable."  Joint Statement of Agreed Facts at 7.  Plaintiff was discharged from Legacy Meridian Park Hospital on May 27, 2016, with the instruction that she could return to her "regular diet." *Id*.

On June 20, 2016, Plaintiff was admitted to Legacy Meridian Park Hospital for eight days for "a lung cavity workup."  Joint Statement of Agreed Facts at 7.  Plaintiff underwent a "wedge biopsy . . . with Video-Assisted Thoracoscopic Surgery" without complications.  Her "biopsy results were negative and without evidence [of] infectious or malignancy process."  Joint Statement of Agreed Facts at 7.  Plaintiff was diagnosed with "C. difficile colitis, Cytomegalovirus (CMV) colitis, COPD, high blood pressure, pulmonary cavitary lesion, reaction to QuantiFERON-TB

test, and ulcerative recto sigmoiditis with GI bleeding." *Id*.
On June 28, 2016, Plaintiff was discharged, directed to "finish
her CMV medication[,] and [told] to follow-up for further
evaluation as needed." *Id*.

On July 11, 2016, Plaintiff was again admitted to Legacy
Meridian Park Hospital and diagnosed with chronic colitis with
"severe activity/ ulceration and refractory ulcerative colitis."
Joint Statement of Agreed Facts at 7.  Plaintiff underwent a
laparoscopic total abdominal colectomy with end ileostomy, which
is "a surgical procedure [that brings] the end or loop of the
small intestine out onto the surface of the skin." *Id*.  On
July 28, 2016, Plaintiff was discharged from Legacy Meridian Park
Hospital.  "Although a low residue diet was suggested, the
discharge summary stated that she was able to take regular food
before her discharge and had a Stoma bag for collecting semisolid
stool." *Id*.  Plaintiff was directed to have "follow-ups for IVC
filter removal and to schedule a follow-up on her treatment as
needed.  [She was] given Dilaudid 4 mg (an opioid used to treat
moderate to severe pain) by mouth for pain management." *Id*.

On July 29, August 18, and September 8, 2016, Plaintiff had
follow-up appointments with various doctors.

On February 8, 2017, Plaintiff was seen by Defendant Louis
Peng, M.D., "to discuss [Plaintiff's] post-operative
medications."  Joint Statement of Agreed Facts at 8.

8 - OPINION AND ORDER

On March 14, 2017, Plaintiff was admitted to Legacy Meridian Park Hospital for "an elective hysterectomy due to a large uterine mass and creation of an ileoanal pouch after completion proctectomy." Joint Statement of Agreed Facts at 8. On March 27, 2017, Plaintiff was "tolerating her diet well[,] her pain was controlled with post-op medications," and she was discharged.

On March 31, 2017, Plaintiff requested a low-residue diet, but her request was denied because there was not any medical indication for that diet.

On April 20, 2017, Plaintiff was seen by Dr. Peng to discuss the lidocaine patch that Plaintiff had received for pain management, "which was ordered to be cut in half to place at different areas." Joint Statement of Agreed Facts at 8. Dr. Peng noted Plaintiff had been on opiates for her March surgery and "was tapered or weaned off her oxycodone on 4/20/17," but she had a current prescription for Klonopin. Dr. Peng noted "as they continue to prepare for [Plaintiff's] next surgery for establishing bowel control, he was afraid the issue around pain, opiates, constant medical attention will only increase." Joint Statement of Agreed Facts at 8-9.

On August 8, 2017, Plaintiff was admitted to Legacy Meridian Park Hospital and underwent an ileostomy-reversal surgery. At the time of her discharge on August 23, 2017, Plaintiff "was

9 - OPINION AND ORDER

tolerating normal diet, having bowel movements[,] and [her] pain was managed with oral pain meds." Joint Statement of Agreed Facts at 9.

On January 3, 2018, Plaintiff was seen by CCCF medical staff due to abdominal-scar pain "with a non-productive cough." Joint Statement of Agreed Facts at 9. An evaluation by medical staff did not show any evidence of bacterial pneumonia or respiratory distress. On January 16, 2018, Plaintiff had a negative chest x-ray. On January 23, 2018, Plaintiff was seen by Dr. Peng for a weekly check-up, and

> [t]hey discussed that her renal issues were
> negative except for a simple right renal cyst,
> [that she had an] unremarkable ultrasound, . . .
> that her pneumonia had resolved[,] . . . TLC's
> approval for Protonix (a medication used to treat
> symptoms of Gastroesophageal reflux disease
> (GERD)[,] that [Plaintiff] had no edema[,] and
> [that] her recent urinary tract infection (UTI)
> had resolved.

Joint Statement of Agreed Facts at 9.

On February 7, 2018, Plaintiff was seen by CCCF medical services "complaining of anal area irritation and burning pain with intermittent diarrhea since the ileostomy take-down surgery." Joint Statement of Agreed Facts at 9. Medical staff noted Plaintiff had "redness and skin abrasion," but she did not have any vesicles or ulcerations. *Id*. Medical staff directed Plaintiff to "avoid applying Hydrocortisone cream/ointment and recommended a trial of Diflucan, an antifungal medication." *Id*.

10 - OPINION AND ORDER

Plaintiff returned to medical services on February 8, 2018, and reported "the issue had resolved." *Id.*

On February 7, 2018, Plaintiff signed an Authorization to Act form that authorized Multnomah County "to receive, [to] hold and [to] provide her medications to her [when] she is released from ODOC custody into county custody." Joint Statement of Agreed Facts at 9.

On February 14, 2018, Plaintiff was released from the custody of the Oregon Department of Corrections and was provided with "a supply of medications from 2/14/18 to 3/15/18." Joint Statement of Agreed Facts at 10.

On March 28, 2018, Plaintiff filed a Complaint in this Court pursuant to 42 U.S.C. § 1983 against Dr. Steve Shelton, Dr. Snider, Dr. Elizabeth Sazie, Dr. Reed Paulson, Nurse Mendoza, Nurse Poloma, Dr. Peng, and John Does 1-10. Plaintiff alleged during her time as an inmate at CCCF Defendants (1) were deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment to the United States Constitution when they denied her appropriate medical care; (2) violated her rights under the First Amendment when they retaliated against her for "making First Amendment protected statements"; and (3) violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, and/or the Rehabilitation Act, 29 U.S.C. § 504, when they denied her appropriate medical care.

11 - OPINION AND ORDER

On January 21, 2020, Plaintiff filed an Amended Complaint against Drs. Shelton, Snider, and Peng, and Nurse Mendoza. Plaintiff alleges during her time as an inmate at CCCF, Defendants (1) were deliberately indifferent to her serious medical needs in violation of the Eighth Amendment when they denied her appropriate medical care; (2) violated the First Amendment when they retaliated against her for "making First Amendment protected statements"; and (3) violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, and/or the Rehabilitation Act, 29 U.S.C. § 504, when they denied her appropriate medical care.

On February 28, 2020, Defendants filed a Motion for Summary Judgment as to all of Plaintiff's claims.

The Court took this matter under advisement on May 14, 2020.

## **STANDARDS**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). *See also* Fed. R. Civ. P. 56(a). The moving party must show the absence of a dispute as to a material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). In response to a properly supported motion for summary judgment, the nonmoving party must

go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Id.* "This burden is not a light one . . . . The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citation omitted). A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.,* No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011) (citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989)). When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC Holdings LLC*

*v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id*.


**DISCUSSION**

Defendants move for summary judgment on Plaintiff's claims on the grounds that (1) Plaintiff has failed to allege personal involvement by Defendant Shelton, (2) Plaintiff has not established Defendants violated either the ADA or the Rehabilitation Act, (3) Plaintiff has not established Defendants violated the Eighth Amendment, (4) Plaintiff has not established Defendants violated her rights under the First Amendment, and (5) Defendants are entitled to qualified immunity.

**I.    Plaintiff's Claims Against Dr. Shelton**

Defendants move for summary judgment on Plaintiff's claims against Defendant Shelton on the ground that Plaintiff has failed to establish that Dr. Shelton personally participated in the conduct underlying Plaintiff's claims.

The Ninth Circuit has made clear that "'[l]iability under § 1983 must be based on the personal involvement of the defendant. There is no *respondeat superior* liability under

14 - OPINION AND ORDER

section 1983.'" *Shallowhorn*, 572 F. App'x at 546 (quoting *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)).  Plaintiff does not allege any facts in her Amended Complaint that suggest Dr. Shelton personally participated in the alleged deprivation of Plaintiff's medical care.  In her Response to Defendants' Motion for Summary Judgment Plaintiff acknowledges Dr. Shelton "occasionally" provided "direct, hands-on care" of inmates, but "his primary mode of input was through the Therapeutic Level of Care committee (TLC)[, which] . . . would determine when an ODOC patient would be allowed to leave the facility, or seek outside treatment."  Pl.'s Resp. at 13.  Plaintiff asserts her "case was brought to the TLC's, and thus to Dr. Shelton's attention."  *Id*.  Plaintiff, however, does not allege or establish the TLC (or Dr. Shelton in his capacity as a member of the TLC) failed to provide Plaintiff with adequate medical care.  Plaintiff also does not point to any decisions by the TLC that constituted inadequate medical care.  Thus, even if membership on the TLC was sufficient to confer liability, which is questionable, Plaintiff has not pled or proven the TLC and, by extension, Dr. Shelton failed to provide her with adequate medical care.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's claims against Dr. Shelton.

## II.  Plaintiff's Claim that Defendants Violated the ADA and/or the Rehabilitation Act

Plaintiff asserts Defendants violated the ADA and/or the

Rehabilitation Act when they denied Plaintiff access to a medical diet, which "could be construed as . . . deliberate indifference to [Plaintiff's] rights to participate in a program she would have been qualified for."  Pl.'s Resp. at 14.

Defendants move for summary judgment on Plaintiff's ADA/Rehabilitation claim on the ground that the Ninth Circuit has held inadequate medical treatment or the lack of medical treatment is not actionable under either the ADA or the Rehabilitation Act.

### A.    The Law

In *Simmons v. Navajo County, Arizona* the Ninth Circuit held:  "[T]o the extent that [the plaintiffs] argue that [the defendant] violated the ADA by depriving Jasper of 'programs or activit[ies] to lessen his depression,' such argument is not actionable under the ADA.  The ADA prohibits discrimination because of disability, not inadequate treatment for disability." 609 F.3d 1011, 1022 (9th Cir. 2010), *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

Courts in the Ninth Circuit also have specifically concluded denial of a specific diet is not actionable under the ADA or Rehabilitation Act.  *See, e.g., Reyes v. Ryan*, No. CV092020 PHXSMMDKD, 2009 WL 10677722, at *2 (D. Ariz. Nov. 24, 2009), *aff'd*, 424 F. App'x 659 (9th Cir. 2011) ("Plaintiff claims he was denied a diabetic diet.  The ADA and

Rehabilitation Act afford disabled persons legal rights regarding access to programs and activities enjoyed by all, but do not provide them with a general federal cause of action for challenging the medical treatment of their underlying disabilities.")(quotation omitted)).  As one court explained,

> Defendant CCS argues that dismissal of the ADA and Rehabilitation Act claims is warranted, because neither statutory scheme has ever been applied to give rise to a cause of action for inadequate or denied medical treatment, especially in the context of inmate care.  Dkt. 90 at 15, citing to *inter alia, Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996); *Nails v. Laplante*, 596 F. Supp. 2d 475, 481-82 (D. Conn. 2009); *Fitzgerald v. Corrections Corp. of Am.*, 403 F.3d 1134, 1144 (10th Cir. 2005); *Carrion v. Wilkinson*, 309 F. Supp. 2d 1007, 1016 (N.D. Ohio 2004).

> Plaintiffs cursorily push back, arguing that the alleged disability discrimination for the ADA and Rehabilitation claims "comes not from the failure to provide medical treatment, but the failure . . . to provide the reasonable accommodation of allowing Plaintiff to move to a lower bunk for his safety[.]"  Dkt. 113 at 31.

> Plaintiffs' argument is unpersuasive, because legal authority discussing ADA and Rehabilitation Act claims shows no such difference between "medical treatment," *e.g.*, receiving Mirapex for restless leg syndrome, and "allowing Plaintiff to move to a lower bunk[.]"  The failure to allow Mr. Roosma to sleep on a bottom bunk can be analogized to other unaddressed medical needs that did not give rise to claims for disability discrimination, such as a diabetic requesting a special diet . . . or an inmate requiring outdoor recreation to prevent depression.  In such cases, courts have observed the bedrock rule that the statutory protections from disability discrimination extend only to "prohibit[ ] discrimination *because of* disability, not inadequate treatment for disability."  *Simmons*,

> 609 F.3d at 1022 (emphasis added), citing to
> *Bryant*, 84 F.3d at 248-249 ("[T]he [ADA] would not
> be violated by a prison's simply failing to attend
> to the medical needs of its disabled
> prisoners[.]").  Plaintiffs have presented no
> basis to depart from this axiom.

*Roosma v. Pierce Cty.*, No. 3:16-CV-05499-RJB, 2018 WL 784590,

at *6 (W.D. Wash. Feb. 8, 2018)(emphasis added).  *See also Feleki*

*Martinez v. Cal. State Prison*, Corcoran, No. 119CV00108DADBAMPC,

2019 WL 2544257, at *5 (E.D. Cal. June 20, 2019), report and

recommendation adopted *sub nom. Martinez v. Cal. State Prison*

*Corcoran*, No. 119CV00108DADBAMPC, 2019 WL 6683160 (E.D. Cal.

Dec. 6, 2019)("[P]laintiff's allegations of inadequate medical

care do not state a claim under the ADA.").

**B. Analysis**

Here Plaintiff, like the plaintiffs in *Reyes, Roosma*,

and *Feleki*, alleges inadequate treatment for her disability

rather than discrimination because of her disability.  The Court,

therefore, concludes Plaintiff's claim is not actionable under

either the ADA or the Rehabilitation Act.

Accordingly, the Court grants Defendants' Motion for

Summary Judgment as to Plaintiff's claim for violation of the ADA

and/or the Rehabilitation Act.

**III. Plaintiff's Eighth Amendment Claim**

Plaintiff contends Defendants were deliberately indifferent

to her serious medical needs in violation of the Eighth Amendment

when they did not consistently provide her with a low-residue
diet, did not provide her with sufficient medical treatment for
her ulcerative colitis, and delayed her surgery to have her colon
reconnected to her intestine.

### A.    The Law

Deliberate indifference to serious medical needs is a
cognizable claim for violation of the Eighth Amendment
proscription against cruel and unusual punishment.  *Estelle v.
Gamble*, 429 U.S. 97, 104 (1976).  *See also Colwell v. Bannister*,
763 F.3d 1060, 1066 (9th Cir. 2014)(same).

> To sustain [a] deliberate indifference claim, [a
> plaintiff must] meet the following test:  "First,
> the plaintiff must show a serious medical need by
> demonstrating that failure to treat a prisoner's
> condition could result in further significant
> injury or the unnecessary and wanton infliction of
> pain.  Second, the plaintiff must show the
> defendant's response to the need was deliberately
> indifferent."

*Peralta v. Dillard*, 704 F.3d 1124, 1127 (9th Cir. 2013)(quoting
*Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)).  To satisfy
the second prong (*i.e.,* that defendant's response to the need was
deliberately indifferent), a plaintiff must show there was
"'(a) a purposeful act or failure to respond to a prisoner's pain
or possible medical need and (b) harm [was] caused by the
indifference.'"  *Id*. (quoting *Jett*, 439 F.3d at 1096).
Deliberate indifference may be established by showing that prison
officials denied, delayed, or intentionally interfered with

medical treatment or by the way prison officials provided medical care. *Jett*, 439 F.3d at 1096.

"Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004)(citation omitted). *See also Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012)("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). In addition, "a plaintiff's showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference." *Wilhelm*, 680 F.3d at 1122 (quotation omitted).

**B.   Analysis**

**1.   Low-Residue Diet**

As noted, Plaintiff asserts Defendants denied her adequate medical care when they did not consistently provide her with a low-residue diet. Defendants assert Plaintiff has not established that a low-residue diet is medically necessary in the treatment of ulcerative colitis. According to Defendants, therefore, Plaintiff has not established Defendants' failure to provide her with a low-residue diet was "a purposeful act or failure to respond to a prisoner's pain or possible medical need [or that] harm [was] caused by the indifference." *Peralta*, 704

F.3d at 1127.

Dr. Shelton testified in his deposition that he is familiar with ulcerative colitis and the recommended medical "interventions and strategies." Decl. of Nathaniel Aggery, Ex. 2 at 7. Dr. Shelton testified medical literature did not recommend any particular diet for ulcerative colitis, and a low-residue diet is not a treatment for that condition. Dr. Peng testified at deposition that he believed Plaintiff had Crohn's disease, but there was not any particular diet that was medically indicated to treat Crohn's disease or ulcerative colitis. Specifically, Dr. Peng stated "sometimes a particular type of food can trigger a flare, whether it be Crohn's or ulcerative colitis in a patient. But it may not happen in another patient. . . . [E]ach person with a Crohn's diagnosis will just have their own type of diet that they need to follow." Chavez Decl., Ex. 8 at 22. Dr. Snider also testified at deposition that there is not a particular diet for individuals with Crohn's disease and that "every person [with Crohn's disease] has a particular do-not-eat list." Aggery Decl., Ex. 3 at 5. Similarly, Todd Wilcox, M.D., Defendants' medical expert, testified in his Declaration as follows:

> [Plaintiff] asserts [Defendants] failed to provide
> her with an appropriate diet to manage her UC
> [ulcerative colitis]. However, a "medical diet"
> is not a part of the treatment course for UC.
> Additionally, a "low residue diet" is not part of
> the medical literature as treatment for UC and it

> does not impact the course of the disease.
> However, a low residue diet (one that limits fiber
> intake) may be used to minimize the output of
> colostomy and may mitigate some of the symptoms of
> ulcerative colitis.  [Defendants] approved a low
> residue diet in April 2015.  The medical chart
> shows that [Plaintiff] was encouraged to consume a
> low residue diet at various points in her
> treatment.  She was also cleared to return to a
> "regular diet" at various points in her treatment.
> On 3/31/17, [Plaintiff] requested a low residue
> diet, but the request was denied because it was
> not medically indicated.  The medical evidence at
> the time supported this conclusion.

Decl. of Todd Wilcox, M.D., at ¶ 14.

To support her assertion that a low-residue diet was medically necessary to treat her ulcerative colitis Plaintiff points out that she was put on a low-residue diet occasionally. Plaintiff, however, did not provide any medical expert testimony or medical evidence that contradicts Defendants' evidence that a low-residue diet was not medically necessary nor indicated for treatment of ulcerative colitis.  At best, Plaintiff suggests "nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another," which is "insufficient, as a matter of law, to establish deliberate indifference."  *Wilhelm*, 680 F.3d at 1122 (quotation omitted).

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes a reasonable juror could not find on this record that Defendants were deliberately indifferent to Plaintiff's serious medical needs when they did not consistently provide her with a low-residue diet.  The Court,

22 - OPINION AND ORDER

therefore, grants Defendants' Motion for Summary Judgment as to that portion of Plaintiff's Eighth Amendment claim based on Defendants' failure to provide her with a low-residue diet.

### 2.    Medical Care for Plaintiff's Ulcerative Colitis

Plaintiff asserts Defendants denied her adequate medical care when they did not provide her with sufficient medical treatment for her ulcerative colitis. Specifically, Plaintiff asserts in her Response that she did not receive "direct treatment for her ulcerative colitis condition in the months leading directly to her April 10, 2016, episode." Pl.'s Resp. at 11. Plaintiff notes Drs. Shelton and Peng testified ulcerative colitis or Crohn's disease "can be treated with anti-inflammatory medications, steroids, biologics," topical medications, mesalamine or acetylsalicylic acid-based treatment. Aggrey Decl., Ex. 2 at 2; Chavez Decl., Ex. 8 at 22. Plaintiff asserts Defendants did not provide her with any of these treatments.

As noted, the record reflects on February 9, 2015, Plaintiff underwent a colonoscopy and upper endoscopy to further evaluate her "gastrointestinal bleed, iron anemia, and an upper GI bleed." Joint Statement of Agreed Facts at 3. The colonoscopy and upper endoscopy reflected proctitis, left-sided colitis, and "mild gastritis." Chavez Decl., Ex. 1 at 1. A March 17, 2015, chart note reflects a biopsy of Plaintiff's colon

23 - OPINION AND ORDER

showed ulcerative colitis, a biopsy of her small intestine and stomach was benign and did not reflect celiac disease, and a "polyps biopsy" was negative for Pylori.  Chavez Decl., Ex. 1 at 2.  On March 20, 2015, Plaintiff requested a "low residue diet" or a gluten-free diet and information on Crohn's disease. *Id*.  On April 17, 2015, Plaintiff "was approved a low residue diet for one year."  Joint Statement of Agreed Facts at 4.  On December 29, 2015, Plaintiff requested Ensure "due to [her] history of Crohn's disease" and her weight loss.  Nurse Mendoza noted "no significant findings" on examination of Plaintiff and advised Plaintiff that Ensure "isn't medically necessary." Chavez Decl., Ex. 4 at 1.  Plaintiff was seen by medical staff at CCCF approximately 12 times between December 29, 2015, and April 10, 2016, for issues related to her various conditions and was prescribed various medications for treatment/pain relief.  In fact, on April 8, 2016, Plaintiff requested "more klonapin and oxy for this flare."  Chavez Decl., Ex. 2 at 4.  In addition, Plaintiff was seen numerous times after her April 10, 2016, episode by various doctors and other medical staff at CCCF and at Legacy Meridian Park Hospital for treatment related to her ulcerative colitis or Crohn's disease.  Plaintiff was prescribed several medications and underwent many tests, procedures, and surgeries.  Plaintiff's condition is a long-term genetic disease that changes over time.  The record reflects Defendants employed

various treatment modalities in an effort to treat Plaintiff's
condition over the five years that Plaintiff was incarcerated at
CCCF.

Viewing the evidence in the light most favorable
to Plaintiff, the Court concludes a reasonable juror could not
find on this record that Defendants failed to provide Plaintiff
with adequate medical treatment for her ulcerative colitis.

### 3.  Surgical Delay

Plaintiff also alleges Defendants were
deliberately indifferent to her serious medical needs when they
delayed her surgery to have her colon reconnected to her
intestine.  Specifically, Plaintiff alleges in her Amended
Complaint that she was scheduled for surgery to have her colon
reattached to her intestine in January 2017, but her surgery was
delayed "because Defendants kept her on blood thinners" despite
knowing about her upcoming surgery.  Plaintiff testified at
deposition that at some point an unidentified doctor told an
unidentified medical professional at CCCF to stop giving
Plaintiff blood thinners because "we had to cancel the surgery
. . . because [Plaintiff] wasn't going to bleed out on my table
and die again."  Chavez Decl., Ex. 8 at 8.  The portion of her
deposition on which Plaintiff relies, however, does not identify
either the doctor who allegedly made the statement or the doctor
to whom the statement was directed, the surgery referenced, or

when the conversation occurred.  In addition, the medical record
submitted to the Court does not contain any reference to surgery
scheduled for Plaintiff in January 2017, Plaintiff going to
surgery but returning without undergoing the surgery due to being
on blood thinners, or any information about a medical
professional being directed to stop blood thinners.

        Dr. Peng testified at deposition that a document
identified as "Price-meds-2403" noted Plaintiff's "surgery to be
rescheduled," but he could not remember which surgery was
referenced.  Aggrey Dep., Ex. 4 at 5.  Dr. Peng noted the same
document indicated "prior to surgery the [blood thinner] should
be stopped."  *Id.*  Dr. Peng recalled Plaintiff was on blood
thinners because

> she had a blood clot in her leg, one of the
> surgeries she had, it may have been in the one
> April 2017.  And then she had a filter placed in
> her inferior vena cava to prevent the blood clot
> from traveling to her lung.  So she's on Coumadin
> to prevent the clot around -- forming around the
> filter.  That's one of the complications, can be
> one of the complications of the filter.  And she's
> also on Coumadin because of the clot itself.

*Id*.

        On this record the Court concludes Plaintiff has,
at best, shown nothing more than "mere negligence in . . .
treating a medical condition, which, "without more, does not
violate a prisoner's Eighth Amendment rights."  *Toguchi*, 391 F.3d
at 1057.  *See also Wilhelm*, 680 F.3d at 1122 ("Medical

malpractice does not become a constitutional violation merely because the victim is a prisoner."). In addition, "a plaintiff's showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference." *Wilhelm*, 680 F.3d at 1122 (quotation omitted).

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's Eighth Amendment claim for Defendants' alleged failure to provide her with adequate medical care.

## IV. Plaintiff's First Amendment Claim

Plaintiff alleges in her Amended Complaint that Defendants violated her rights under the First Amendment when Dr. Snider removed medications from Plaintiff's cell and removed her work restrictions after Plaintiff "engaged in constitutionally-protected speech when she sought redress for her medical issues from doctors outside of" CCCF. Am. Compl. at ¶ 39.

The Ninth Circuit has held

> [w]ithin the prison context, a viable claim of
> First Amendment retaliation entails five basic
> elements: (1) An assertion that a state actor
> took some adverse action against an inmate
> (2) because of (3) that prisoner's protected
> conduct, and that such action (4) chilled the
> inmate's exercise of his First Amendment rights,
> and (5) the action did not reasonably advance a
> legitimate correctional goal.

*Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2004)

27 - OPINION AND ORDER

(citations omitted).

### A.    Removal of Medication from Plaintiff's Cell

In her Response to Defendants' Motion for Summary Judgment Plaintiff asserts she "suffered a catastrophic ulcerative colitis flare on April 10, 2016.  Upon her return [from Legacy Meridian Park Hospital], Dr. Snider confiscated 'contraband' he found in her locker, and removed her medical restriction from working while in custody on or about April 22, 2016."  Pl.'s Resp. at 2.

Dr. Snider testified at deposition that it was "unusual" for him to do contraband review, but on April 11, 2016, the day Plaintiff returned from Legacy Meridian Park Hospital, nurses brought Dr. Snider "a whole cart, if not two carts of medicine in big bags" from Plaintiff's cell for his review. Aggrey Decl., Ex. 3 at 7.  Dr. Snider "counted the days of supply that [Plaintiff] had on her medications [in her cell] and for the most part they were all over a month's supply other than the isosorbide, which she had a 26-day supply of."  *Id*. at 6.  An April 11, 2016, Provider Summary Discharge Note listed the following medications and amounts of medication found in Plaintiff's cell:  a 64-day supply of Sucralfate, a 48-day supply of Zocor, a 48-day supply of Mobic, a 51-day supply of Aspirin, a 50-day supply of iron, a 41-day supply of Synthroid, five tubes of lidocaine jelly, six boxes of enemas, two bottles of nitro,

and two Symbicort inhalers, which would last plaintiff longer
than 30 days.  Aggrey Decl., Ex. 3 at 7; Chavez Decl., Ex. 2
at 1.  Dr. Snider testified at deposition that on April 11, 2016,
he believed inmates were not allowed to have more than 30 days of
medical supplies in their possession, and, therefore, the excess
medications were contraband.  Plaintiff, however, continued to
have access to medications through medical services, and the
record reflects she was issued certain medications to keep in her
cell at some point between April 11, 2016, and April 19, 2016.

Plaintiff asserts she has established a question of
material fact as to Dr. Snider's alleged retaliation against
Plaintiff due to the fact that she "advocated for herself."  She
states she was told by CCCF staff to "'stay on the low' regarding
her medical needs because if she did not, Dr. Snider would take
away the only pain relief medication she was taking."  Am. Compl.
at ¶ 18.  Plaintiff, however, does not point to any evidence that
indicates she was permitted to keep more than 30 days of medical
supplies in her cell generally or that she was permitted to keep
all of the medications found in her cell specifically.

As noted, in response to a properly supported motion
for summary judgment, the nonmoving party must go beyond the
pleadings and show there is a genuine dispute as to a material
fact for trial.  *Rivera*, 395 F.3d at 1146.  "This burden is not a
light one . . . .  The non-moving party must do more than show

there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d at 387.

The Court concludes on this record that Plaintiff has not established there is a genuine dispute of material fact as to whether Dr. Snider removed Plaintiff's medications from her cell in retaliation for Plaintiff "advocat[ing] for herself against" Dr. Snider and/or because she went to Legacy Meridian Park Hospital for treatment.

**B.    Work Duty**

Plaintiff asserts Dr. Snider placed her on work duty in the kitchen "immediately following her [April 10, 2016,] medical episode" in retaliation for her seeking medical care at Legacy Meridian Park Hospital.  Dr. Snider testified at deposition that he does not recall revoking Plaintiff's medical waiver for work, he does not know whether the Oregon Department of Corrections has a policy that requires inmates to work, and he does not know where "it would be noted [that Plaintiff] had to go and work anywhere."  Aggrey Decl., Ex. 3 at 8.  The record reflects Plaintiff reported to medical staff on April 22, 2016, that she needed a work waiver because "they put me in the kitchen!  I can't work!"  Chavez Decl., Ex. 6 at 1.  On April 25, 2016, Plaintiff told medical staff that she could not work in the kitchen, but she could do "other work in laundry."  *Id*. at 2. The record reflects Plaintiff was given a work waiver by medical

staff and did not work in the kitchen.

There is not any evidence in the record that Dr. Snider or any other Defendant revoked Plaintiff's work waiver or placed her on work duty in the kitchen nor is there any evidence that Defendants did so in retaliation for Plaintiff "advocat[ing] for herself against" Dr. Snider and/or undergoing medical care at Legacy Meridian Park Hospital.

The Court concludes on this record that Plaintiff has not established there is a genuine dispute of material fact as to whether Dr. Snider revoked her work waiver or caused her to be assigned to work in the kitchen because Plaintiff "advocated for herself against" Dr. Snider and/or went to Legacy Meridian Park Hospital for treatment.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's First Amendment Claim.

**V.    Qualified Immunity**

As noted, Defendants contend they are also entitled to qualified immunity as to all of Plaintiff's claims.  The Court, however, already has concluded Defendants did not violate Plaintiff's constitutional rights.  The Court, therefore, does not address Defendants' qualified immunity argument.

**CONCLUSION**

For these reasons, the Court **GRANTS**  Defendants' Motion

31 - OPINION AND ORDER

(#44) for Summary Judgment and **DISMISSES** this matter **with**

**prejudice.**

IT IS SO ORDERED.

DATED this 15th day of June, 2020.


/s/ Anna J. Brown

_____

ANNA J. BROWN
United States Senior District Judge

32 - OPINION AND ORDER